UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:17-CR-25-REW |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| ANWAR MITHAVAYANI, and | ) | |
| PETE ANTHONY TYNDALE, | ) | |
| | ) | |
| Defendants. | | |

*** *** *** ***

In February 2019, after a trial spanning two fortnights, a jury unanimously convicted Anwar Mithvayani and Pete Tyndale (as well as their Co-Defendant Dr. Timothy Gowder) of conspiring to unlawfully distribute pain pills, laundering the proceeds, and engaging in transactions funded by dirty money. Defendants[1] now argue that, based on the record proof, the jury could not have rationally convicted them. Because the Government presented sufficient evidence at trial for a reasonable factfinder to find beyond a reasonable doubt that Mithavayani and Tyndale committed the crimes of conviction, the Court denies Defendants' Rule 29 motions.

Alternatively, Defendants claim that the interests of justice require a new trial. They claim that an evidentiary dearth, multiple court errors, and a logically flawed verdict warrant a fresh adjudication. The Court sees strong evidence, valid rulings, and a result consistent with record proof. Thus, the Court also denies Defendants' Rule 33 requests.

---

[1] Tyndale moves to join Mithavayani's motion for acquittal or a new trial. DE 419. The Government does not oppose the joinder request. *See* DE 425. The Court **GRANTS** DE 419 to the extent Tyndale seeks to join Mithavayani's motion.

## I. BACKGROUND

In January 2018, a grand jury returned an indictment charging Defendants with conspiring to distribute unlawfully oxycodone and oxymorphone (Count 1) and launder the proceeds (Counts 5 & 6). *See* DE 46 (Superseding Indictment). Defendants also faced independent charges for conducting transactions with drug proceeds under 18 U.S.C. § 1957 (Mithavayani—Counts 13, 19-22, 24 & 25; Tyndale—Counts 15-20, 22 & 24) and conducting such transactions with the intent to conceal under 18 U.S.C. § 1956(a)(1)(B)(i) (Mithavayani—Counts 14, 23 & 26; Tyndale—Count 23). Defendants pleaded not guilty and proceeded to trial. From January 10 through February 1, the Government presented evidence that Defendants ran and profited handsomely from a "pill mill" in Hixson, Tennessee. After the prosecution rested, and again at the close of proof, Defendants moved for judgments of acquittal. DE 388 (Minute Entry – Day 15). The Court denied the motions. *Id.* Following three days of deliberations, the jury convicted Tyndale and Mithavayani on all but the non-conspiracy § 1956(a)(1)(B)(i) Counts. *See* DE 405 (Mithavayani Verdict); DE 406 (Tyndale Verdict).

Here, Tyndale and Mithavayani jointly seek judgments of acquittal or, alternatively, a new trial. *See* DE 417 (Mithavayani Motion) & DE 419 (Tyndale Motion). The Government responded. DE 425. The motions stand ripe for review.

## II. RULE 29 MOTIONS

A defendant seeking acquittal based on evidence insufficiency "bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). Under Rule 29, courts may supplant a jury conviction only if a defendant shows that no reasonable jury could have found that the prosecution proved the essential charge elements beyond a reasonable doubt. *See Jackson v. Virginia*, 99 S. Ct. 2781, 2789 (1979). In conducting this analysis, a court does not weigh the

evidence anew but views all proof through a prosecution-favorable lens. *United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013) (citation omitted). Inference and credibility assessments, too, must favor the verdict. *United States v. Newsom*, 452 F.3d 593, 608 (6th Cir. 2006).

*Trafficking Conspiracy*

As to the drug conspiracy charge, the Government had to prove, beyond a reasonable doubt, (1) an agreement to violate the drug laws and, (2) that Defendants knowingly joined the conspiracy and voluntarily participated. *See United States v. Sadler*, 750 F.3d 585, 593 (6th Cir. 2014). Defendants claim that the trial evidence, "taken in [the] light most favorable to the government, was insufficient to prove the existence of an illegal drug trafficking scheme within TPI or that [Defendants] joined a conspiracy to engage in same." DE 417 at 2. The Court disagrees.

Regarding the first element, the Government's case included copious proof that painted the Tennessee Pain Institute (TPI) as a sham clinic set up to divert oxycodone and oxymorphone to a patient cohort significantly populated by addicts and other traffickers, via prescriptions serving no legitimate medical purpose. As to the existence of an agreement, case proof showed that in 2011, Tyndale and Mithavayani opened TPI and recruited Dr. Gowder as the practicing physician. Gov. Ex. 75 (Gowder TN Bd. Hrg. Tr.) at 1059–60; Gov. Ex. 53 (Mithavayani-signed lease for the TPI property). Though Dr. Gowder later became TPI's nominal owner through a purchasing entity— Tennessee Pain Institute Physicians—the proof showed that Tyndale and Mithavayani (through the jointly-owned Health Care Managers, "HCM," and other Defendant-owned entities) reaped the lion's share of clinic profits, exercised control over patient scheduling, received complaints about prescribing and patients, paid the clinic bills, and stored and controlled (through the Mithavayani owned "Griffin Data") all patient records. *See, e.g.*, Mithavayani Exs. 68, 69 & 73 (Mithavayani Agreements for Medical Records Management, Accounting Services, and Marketing). The

evidence showing that the moving Defendants set up and ran the clinic (as well as the subsequent

North Carolina clinic) was sufficient to establish, generally, an agreement. *Sadler*, 750 F.3d at 593

(citing, as part of "[a]mple evidence" supporting a conspiracy charge, proof of an agreement that

defendant "owned and operated several pain-management clinics[.]").

As to the illicit nature and subject matter of the agreement, the Government again presented

ample proof. Briefly:

- Physical evidence seized from TPI included complaint and patient files indicating that the clinic ignored strong evidence of addiction and diversion by patients (including failed drug screens, pill counts, and explicit allegations) while continuing to dispense opioids.

- Lay testimony from numerous patients (many of them admitted addicts and/or diverters) described TPI visits as including virtually no evaluation (or re-evaluation) of underlying injuries or ailments alongside unexplained dosage increases.

- Expert testimony from Dr. Eason indicated that each of the 42 TPI patient files he reviewed included illegitimate prescribing.[2]

- Eason further testified that the exorbitant doses he reviewed, consistently equaling or exceeding 120 monthly oxycodone 30mg pills (and often accompanied by multiple daily doses of the stronger opiate, oxymorphone), were *never* appropriate.

- Patient files not included in Eason's review reflected like prescribing.[3]

- Documentary proof from the Tennessee Board of Medical Examiners included Dr. Gowder's explicit admission to prescribing controlled substances without a legitimate medical purpose. [The proof also showed that HCM, owned by Mithavayani & Tyndale and well aware of the enforcement action, paid for Gowder's representation before the board.]

In short, the proof as to an illicit distribution agreement was strong. *See, e.g.*, *United States v.*

*Elliott*, 876 F.3d 855, 858, 866 (6th Cir. 2017) (rejecting challenge that expert testimony was

---

[2] This figure included 30 randomly drawn Kentucky patients and 12 patients specifically selected for analysis. Dr. Eason criticized the prescribing practices across the entire set.

[3] Statistically, the prescription patterns for Kentucky patients matched the prescription practices across all patients. Over 65% of all TPI dosage units prescribed were for oxycodone. Including Xanax and oxymorphone runs the number to 90%.

necessary to establish that average prescribing "of 120 to 150 oxycodone tablets for a month's use" was illegal where physician's "examinations were cursory, the practices of the [clinic] highly irregular, and the doses prescribed at the clinic clearly in excess of any medical need."), *cert. denied sub nom. Frial-Carrasco v. United States*, 138 S. Ct. 1314 (2018).

Defendants' challenge to the second element relies on two theories the Sixth Circuit has rejected. Essentially, Defendants claim that their role involved only innocent tasks and there is no direct proof showing their knowledge "that the actions of the doctors at the clinic were outside the scope of professional practice." DE 417 at 2. Yet, the Government "had no obligation to produce 'direct evidence' against [Defendants], as 'guilty knowledge and voluntary participation may be inferred from surrounding circumstances.'" *Sadler*, 750 F.3d at 593 (quoting *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991)). And, despite Defendants' contrary claims, expertise simply is not, at least in a case of this type, a prerequisite for knowledge that prescriptions are illegitimate. Indeed, in circumstances involving virtually identical prescribing, the Sixth Circuit has held that "lay understanding" is sufficient to parse "distributions [that] plainly exceed medical use." *Elliott*, 876 F.3d at 864.

As Judge Thapar aptly stated in rejecting an analogous theory:

It is true that a defendant cannot knowingly or voluntarily join a conspiracy without first knowing about it. But training is not a prerequisite for knowing about a conspiracy. A pill mill does not run on doctors alone[.] . . . And when the jig is up, these non-doctors are just as liable as the doctors who dispensed the pills. *See, e.g.*, *United States v. Hicks*, 529 F.2d 841, 844 (5th Cir. 1976) (finding "no merit" to the defendant's argument that his conviction for a drug conspiracy should have been overturned because he was "a security guard with a fourth-grade education and not a doctor"); *United States v. Smith*, 573 F.3d 639, 646 (8th Cir. 2009) ("Lay persons who conspire with or aid and abet a practitioner's unlawful distribution of drugs can be convicted under the [Controlled Substances Act] and its regulations."). The relevant inquiry, then, is not whether a defendant was a physician, but whether he knowingly and voluntarily played some part in a conspiracy to distribute drugs.

*United States v. Solomon*, No. 13-CR-40-ART, 2016 WL 10894663, at \*5 (E.D. Ky. June 23, 2016). Here, the Government introduced proof from which a rational juror could conclude that Defendants formulated and implemented policies to cover up or shield TPI's illicit activity. *See, e.g.*, Gov. Ex. 40 (TPI Rules). The rules related to parking also imply that Defendants were aware of "the distances [TPI patients] traveled to obtain prescriptions at the clinic." *Elliott*, 876 F.3d at 864 (noting that knowledge of distance and "extremely short time [the physician] spent with patients" supported the conspiracy conviction). The prosecution also showed that Defendants instructed TPI staff to schedule as many as eight patients per hour and provided referral bonuses to patients. *See* Gov. Ex. 30 (TPI instructions for making an appointment).[4] TPI accepted only cash or cash equivalents—a factor that TFO Richard Dalyrymple testified was a red flag. Were this not enough, the Government-exhibited complaint TPI forms explicitly direct that they be returned "to the CEO" (a role TPI's office manager tapped as Mithavayani's). *E.g.*, Gov. Ex. 43 (TPIP Complaint Forms) at 2. Proof also showed that Defendants received failed drug screen results via e-mail,[5] reviewed (though, on a limited basis) patient files, and monitored clinic activity via remotely accessible surveillance cameras. *See* Gov. Exs. 18A-C (TPI interior photos showing surveillance cameras). Mithavayani-owned Griffin Data also undisputedly possessed electronic versions of the TPI patient files, which clearly told the illicit prescribing tale.

Witnesses repeatedly described Mithavayani and Tyndale as having operational charge of TPI, and prior patients testified about the cursory examination and prescription-writing processes within the clinic. The clinic had little in the way of diagnostic or medical equipment, and the patients came to receive prescriptions, with no other regular treatment emerging across the broad

---

[4] Tyndale also complained that a physician at the Murphy clinic was taking too long to see patients. *See* Gov. Ex. 110 (E-mail to Randy Long).
[5] *See* Gov. Ex 82K (Hankins e-mail to Mithavayani with subject line "Pete- Test results").

course of the case record. The owners' eyes in the sky—the surveillance cameras—fairly ensured that Mithavayani and Tyndale would know, granularly, about the details of clinic life without being physically on the scene.

The prosecution, through Tyndale's former girlfriend (Jenna Crawley), also presented proof that: (1) Mithavayani and Tyndale were business partners since early 2010; (2) Tyndale was, at minimum, intimately familiar with the operation of multiple pill mills in Florida [Indeed, Tyndale ran a mobile MRI that operated for a time in the parking lot of a South Florida strip club.] ; (3) Tyndale and Mithavayani opened TPI and hired the staff; (4) despite the on-paper ownership shift to Dr. Gowder after a change in state law, Defendants were the true owners throughout. As Defendants cast it, Health Care Managers was simply a managerial company tasked with administrative and human resources duties. Yet, documents showing joint Mithavayani-Tyndale ownership of HCM and various Mithavayani- and Tyndale-owned entities' financial records (showing size and timing of distributions), substantiate Crawley's depiction of Defendants as *de facto* TPI owners. Ultimately, the Government gave the jury plentiful grounds to reject the Defendants' portrayal of themselves as mere innocent contractors, bookkeepers, and clerks.

The financial paper trail showed that TPI generated $8,161,205 in total receipts. *See* Gov. Exs. 83A (Summary Chart – TPI Intake); 84A & 84K (HCM Account Deposits). Of the $5,454,348 in distributions traced from HCM Accounts to the Defendants' (or Defendant-controlled)[6] accounts, at least 70% went to Mithavayani ($1,934,087) and Tyndale ($1,934,087). *See* Gov. Exs. 83E (Summary Chart – Distributions); 86A & 87A (Gowder Distributions); 88A (Moore Distributions); 89A & 90A (Tyndale Distributions); 91A, 92A & 93A (Mithavayani Distributions).

---

[6] Including Mithavayani-owned "Griffin Data, LLC" and "Bills B Gone" as well as Tyndale-owned "Givenchy Consulting Group Inc."

Surely, the jury could be highly and rightly skeptical over the structure, operation, and bona fides of an entity where the people nominally just hiring staff and cleaning the bathrooms made double what the licensed professionals made. Such an inversion both indicates the obvious sway of Mithavayani and Tyndale and impeaches the legitimacy of the endeavor.

The proof regarding Defendants' mirroring efforts to set up a North Carolina (the "Murphy" clinic), after Mithavayani knew the Tennessee Board was coming "down hard" hard on Dr. Gowder,[7] offered further support on the knowledge element. Prior to shuttering TPI on June 30, 2016, the clinic sent patients a letter explicitly recommending the Murphy clinic. Gov. Ex. 38 (Letter). Further, well after the DEA raided TPI, on April 6, 2016, Mithavayani and Tyndale met with Dr. Michael Manning, on August 23, 2016, to further the Murphy clinic endeavor. *See Sadler*, 750 F.3d at 593 (noting, as supporting the knowledge element, proof that the defendant continued his heavy clinic involvement "*after* learning that the DEA was investigating the clinics"). Trial testimony also indicated that the Murphy clinic shuffled doctors to ensure that former TPI patients would be receiving prescriptions comparable to those they received from TPI prescribers. This activity further corroborates the Government's theory that Mithavayani and Tyndale knew that their profits (through patient trips) hinged not on the quality of care their clinics gave, but on the quantity of pills their physicians prescribed. The North Carolina clinic proof included evidence showing that clinic staff called and recruited patients with promises of TPI-comparable prescriptions and that the Murphy clinic worked to find physicians that would fall in line on opioid scripts. Tellingly, Mithavayani and Tyndale did not alert potential physician recruits of the DEA's raid on TPI.

---

[7] *See* Gov. Ex. 82M (Mithavayani e-mail to Hankins).

In short, the proof shows that Defendants opened and managed a business whose product was illicitly distributed controlled substances. The necessary criminal pact "may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan." *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015) (citation omitted). Further, a defendant's connection to "the conspiracy need only be slight" and a "tacit or material understanding among the parties to a conspiracy is sufficient to establish the agreement." *Id.* At bottom, Defendants mostly point to proof supporting what was always an undisputed fact: they are not doctors. *See* DE 417 at 2–3; DE 419 at 4–5. "But the government did not need to prove that [Defendants] dispensed oxycodone [themselves]. Nor did the government need to prove that [either] was a doctor who could write prescriptions." *Solomon*, 2016 WL 10894663, at *5. Defendants also highlight (or put their spin on) some proof that the jury could have relied on to acquit them. Yet, Movants mostly ignore the voluminous proof that the jury ultimately relied on to convict them. The Court does not catalogue all of the relevant proof here. Suffice it to say that the Government's case, including thousands of document pages and testimony of more than two score witnesses, included, at minimum, "substantial and competent evidence" supporting an agreement to illicitly distribute controlled substances that the Defendants knowingly and voluntary joined and actively furthered. *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015).[8]

---

[8] The Court, here, addresses Tyndale's sole novel addition to Mithavayani's theories. *See* DE 419 at 5–7. Tyndale claims that: "In applying the logical reasoning of [*Yates v. United States*, 77 S. Ct. 1064, 1073 (1957), *overruled on other grounds by Burks v. United States*, 98 S. Ct. 2141 (1978)], the Court must set aside the verdict . . . because Tyndale's conviction . . . is supportable on one ground but not another." *Id.* at 7. Tyndale tags his *Yates*-based argument as a Rule 29 issue. *See id.* However, a true *Yates* claim does not challenge evidence sufficiency. *Griffin v. United States*, 112 S. Ct. 466, 474 (1991) (noting the "distinction between legal error ([under] *Yates*) and insufficiency of proof ([under] *Turner*)"). Thus, it falls outside Rule 29's coverage. *See* Fed. R. Crim. P. 29(a) (authorizing entry of "judgment of acquittal of any offense for which the evidence is **insufficient to sustain a conviction**" (emphasis added)).

The jury heard a tale of two clinics—a legitimate pain treatment center dealing the best it could with a difficult clientele versus a sham pill mill attempting to profit from diversion while minimizing exposure to legal authorities. Each tale had some supportive proof, and it was for the jury to distinguish between legitimate practices and empty window dressing, to find the flags red (suspicious) or green (legitimate), in the trial's nomenclature. Ultimately, the long list of shady markers—the highly unorthodox patient rules, the physical characteristics of the office, the lack of medical equipment, the meds-only treatment, the pay and enrollment mechanics, the patient demographics, the neighbors' concerns, the medical records, the expert proof, the highly inconsistent screening standards, the Crawley-described pre-TPI Florida roots, the North Carolina relocation, the owners' other post-raid conduct—easily coalesce to rationally support the guilty finding, as to these Defendants, on Count 1.

*Money Laundering & Illicitly Funded Transactions*

As to the money laundering conspiracy, the Government needed to prove: (1) "that two or more persons conspired or agreed to try to accomplish a common and unlawful plan to launder money, in violation of 18 U.S.C. § 1956"[9] and (2) "that the defendant knew about the plan's

---

Here, Tyndale, though citing *Yates*, claims that the verdict must be set aside because Dr. Moore was acquitted and it is impossible to determine whether the jury relied on Dr. Moore or Dr. Gowder's prescribing to convict him. An argument that a verdict is potentially based on a factual predicate not supported by sufficient evidence, though another possible predicate is adequately supported, falls under the rule of *Turner v. United States*, 90 S. Ct. 642 (1970). Under *Turner*, Tyndale's admission that his conviction "is supportable on one ground" (DE 419 at 7) dooms the claim. *Id.* at 654 ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged."). In short, there is no reason to set aside a verdict when, as Tyndale argues, a jury is "left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence[.]" *Griffin*, 112 S. Ct. at 474 (emphasis in original). [The Court also notes, but sees no need to address, the dubious nature of Tyndale's claim that is *impossible* to determine who's prescribing the jury relied on.]

[9] For the Count 5 underlying crime, the Indictment gave the jury §§ 1956(a)(1)(A)(i) & (a)(1)(B)(i) options. Thus the elements included: (1) "that the defendant conducted or attempted to conduct a

unlawful purpose and voluntarily joined in it." DE 400 (Jury Instructions) at 23 (Instruction #17). Regarding the § 1957 counts, the elements include: (A) "that the defendant knowingly engaged or attempted to engage in a monetary transaction"; (B) "that the monetary transaction was in property derived from specified unlawful activity"; (C) "that the property had a value greater than $10,000.00"; (D) "that the defendant knew that the transaction was in criminally derived property"; and (E) "that the monetary transaction took place within the United States." *Id.* at 24 (Instruction #18).

Defendants attack proof sufficiency for the financial crimes on three[10] fronts. First, they note that the Government did not tie specific TPI patient fees to particular HCM distributions. Second, Defendants argue that the prosecution never alleged that Tennessee (versus Kentucky) patient fees were ill gotten. Third, the defense points to Dr. Moore's acquittal as conclusive proof that the jury found that all his generated patients' fees were legit. Collectively, these contentions fall well short of showing that no reasonable jury could have convicted Defendants on the §§ 1956(h) & 1957 Counts.

As to the Moore acquittal, Mithavayani relies on a false equivalency. The jury could have found (and, as the Court views the full record, likely did find) that Moore, though working and

---

financial transaction"; (2) "that the financial transaction involved property that represented the proceeds of the drug-trafficking offense charged in Count 1"; (3) "that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity"; and (4) "that the defendant, as to the transaction, either: (1) had the intent to promote the carrying on of the drug-trafficking offense charged in Count 1; or (2) knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the drug-trafficking offense charged in Count 1." DE 400 at 20 (Instruction #15). For the Count 6 underlying crime, the elements mirrored the individual § 1957 counts. Defendants do not here challenge the accuracy of any of the financial crime instructions.

[10] Tyndale also attempts to leverage his *Yates* argument regarding the trafficking Count as grounds for acquittal on the financial charges. *See* DE 419 at 7. Because the Court rejects the predicate theory, it offers no basis for disturbing any other counts of conviction.

generating income for a drug trafficking conspiracy, was not a knowing and voluntary participant in the criminal enterprise. Further, "[t]here is no requirement that a defendant be separately charged with or convicted of an offense for it to qualify as a predicate offense." *Jamieson v. United States*, 692 F.3d 435, 441 n.4 (6th Cir. 2012). Thus, whether Moore was acquitted, or never charged in the first place, has no bearing on proof sufficiency for these charges as to the other participants. Finally, even if the Moore acquittal and the monetary convictions were inconsistent (a proposition the Court rejects), "a jury is free to render inconsistent verdicts or to employ relevant evidence in convicting on one count that it may seem to have rejected in acquitting on other counts." *United States v. Miller*, 161 F.3d 977, 985 (6th Cir. 1998). The reality is, the jury found that TPI was a pill mill and, thus, its profits were dirty. The evidence strongly supported this finding, and thus the Rule 29 argument fails.

The Court applies similar logic in rejecting the claim that allegedly legal Tennessee patient fees somehow undercut the verdict. Again, the Court notes that Dr. Eason criticized 100% of the patient records he reviewed. This was only a (largely random) sample of the full patient population, but the overall practice prescribing figures show consistently and comparably alarming totals on the Kentucky and entire patient populations. A rational review of Government Exhibits 100A and 100B would arm a jury with sufficient evidence to find the entire operation, and thus operational proceeds, tainted by unlawful prescription practices. Both doctors, of course, admitted improper prescribing before the Tennessee Medical Board.

Further, as a matter of law, the Government was not required to prove that every script written to every patient that walked through TPI's doors was improper. If a criminal business fortuitously attracts legitimate customers, profits from those individuals do not somehow cleanse the illicit activity receipts. Quite the opposite. The legitimate fees are effectively tainted by their

commingling with illicit funds. *United States v. Bencs*, 28 F.3d 555, 562 (6th Cir. 1994) ("[W]e refuse to read the statute in a manner that would reward the more creative money-launderer by allowing him to escape liability altogether by commingling assets or otherwise disguising the source of his funds.").[11]

Finally, Defendants make much of what the Government did not address, *e.g.*, whether the Mithavayani or Tyndale-owned companies provided legitimate services or whether specific patient fees were included in specific HCM distributions. DE 417 at 4–5. Yet, they fail to acknowledge that funneling dirty money through facially genuine companies is precisely the type of conduct that the money laundering statutes criminalize. *United States v. Nickson*, 127 F. App'x 770, 773 (6th Cir. 2005) ("This court has held that the government need not trace funds garnered illegally to their use in a money-laundering scheme on a dollar-for-dollar basis on the theory that money-launderers would be permitted to evade sanctions by commingling illegal assets with legitimate earnings."). Further, the *sine qua non* of the fourth element for a potential predicate for the § 1956(h) conspiracy conviction was a knowing attempt to obfuscate the precise information Defendants castigate Agent Barto for failing to identify, *i.e.*, "the nature . . . [or] the source . . . of the proceeds of [drug trafficking.]" 18 U.S.C. § 1956(a)(1)(B)(i). The fact that the Defendants were partially successful in their money laundering aims does not in any way call into question the sufficiency of the ample proof supporting the financial charges. *Cf. id.* at § 1956(a)(1) ("For

---

[11] This rule, as to § 1956 charges, is clear in the Sixth Circuit. *See id.* As to § 1957, the majority view in the Circuits, though an open question in the Sixth, is that "the Government is not required to trace criminal funds that are comingled with legitimate funds to prove a violation of Section 1957. Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the 'dirty' and 'clean' funds cannot be distinguished from each other." *United States v. Silver*, 864 F.3d 102, 114–15 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018). The defense, facing the burden here, makes no case and cites no law for applying an alternative rule.

purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement."). The defense does not challenge the Government's proof as to any particular element on any of the monetary convictions. Thus, the Court declines a granular analysis. Instead, the Court generally notes that the Government proved the existence of the (undisputed) underlying transactions and that much of the same proof regarding the drug conspiracy discussed above, combined with Agent Barto's testimony, was sufficient for a jury to find both the necessary criminal taint on the funds and defendant's knowledge. As to the concealment intent option for the Count 5 charge, Agent Barto testified that the numerous distributions to various Defendant-owned entities ultimately amounted to a roughly equivalent share of profits that greatly exceeded the income of the physicians who were providing what was nominally the clinic's sole product: pain management. A juror could reasonably rely on HCM's (again, run by Defendants) diffuse distribution practices as an attempt to disguise that Defendants' were taking equivalent, ownership-level profits from their pill mill operation. As to the promotion option for the Count 5 conspiracy, the jury could have reasonably concluded, particularly given the lengthy TPI tenure and the Murphy-clinic proof, that Tyndale and Mithavayani intended to (and did) reinvest the proven TPI profit distributions into their illicit pill-pushing enterprise. *See United States v. Crosgrove*, 637 F.3d 646, 654 (6th Cir. 2011) ("'Promotion' money laundering involves the reinvestment of proceeds of unlawful activity into the illegal scheme from which the proceeds were derived."). As to the $10,000 minimum for the Count 6 charge (and various individual § 1957 counts), the Government fully proved multiple relevant transactions exceeding the threshold.

The Court agrees with the United States that Mithavayani's arguments about the lack of vendor records are unpersuasive. The proof showed that TPI, the proceeds-generating and vendor-paying entity, had no bills for services rendered by HCM, Givenchy, or Bills B Gone. Over $750,000 of clinic income filtered through to Mithavayani and Tyndale, in almost precisely equivalent payments, via these alleged servicers. *See, e.g.*, Gov. Ex. 83D (Summary Chart – Tyndale & Mithavayani Distributions).[12] Whatever the vendor records might show, the TPI records showed exorbitant payments for services with little back up or documentation. Again, this structure, in light of the strong Count 1 conspiracy proof, directly pointed to liability for the various money laundering counts of conviction. The jury rationally treated funds generated from the clinic as tainted proceeds and held Mithavayani and Tyndale responsible for crimes related to such proceeds.

In sum, Defendants fell well short of carrying their "very heavy burden" at the Rule 29 stage. *Abboud*, 438 F.3d at 589. Accordingly, for all the reasons stated, the Court denies the motions.

## III.   RULE 33 MOTIONS

A court's role in deciding a Rule 33 motion is more expansive than its Rule 29 acquittal review. Thus, a district court analyzing a new trial motion may "sit as a thirteenth juror" to assess credibility and weigh facts. *United States v. Munoz*, 605 F.3d 359, 373 n.9 (6th Cir. 2010). Nonetheless, a defendant arguing the verdict "was against the manifest weight of the evidence" must clear a high bar. *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (Rule 33 motions are granted only in the "extraordinary circumstance where the evidence preponderates heavily

---

[12] As to rough equivalency, the records specifically reflect $791,199 in Griffin Data and Bills B Gone combined distributions and $792,536 to Givenchy.

against the verdict."). Courts have also interpreted Rule 33's broad "interest of justice" language to warrant new trials in a host of other circumstances. *See United States v. Griffin*, No. 15-CR-1-ART, 2015 WL 13358334, at *1 (E.D. Ky. Apr. 29, 2015) (collecting cases). Ultimately, however, a new trial is a disfavored remedy, to be granted "with great caution." *United States v. Fritts*, 557 F. App'x 476, 479 (6th Cir. 2014) (citation omitted). Mithavayani[13] briefly sets forth a slew of proposed new trial bases. The Court, for the following reasons, rejects each.

*Evidentiary Weight*

First, Mithavayani argues that the Court should find the verdict against the manifest weight of the evidence based on essentially the same grounds the Court rejected in the Rule 29 analysis. DE 417 at 6. Mithavayani gives no reason why the evidence of guilt, though sufficient under Rule 29, might, with the aid of Rule 33 weighing and credibility options, be dwarfed by evidence favoring acquittal. The Court views the evidence as strongly supporting the Defendants' convictions and sees no manifest disparity. Thus, the Court rejects the summary evidentiary weight claim.

*Instruction Error*

Second, Mithavayani contends that the Court, by failing to give an instruction on non-physician knowledge and by giving a deliberate indifference instruction (per Defendant, unsupported by record evidence), obviated the Government's burden to prove knowledge. DE 417 at 6. Generally, courts "may reverse a judgment based on an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Morrison*, 594 F.3d 543, 546 (6th Cir. 2010) (internal citations and quotation marks omitted).

---

[13] Tyndale joins Mithavayani's motion but asserts only the previously rejected *Yates* theory as a fresh ground for Rule 33 relief. The Court rejects the argument under Rule 33 for the reasons already detailed.

Initially, the Court rejects the assertion, unburdened by authority, that a specific non-physician-knowledge instruction was obligatory. *Cf. Direct Sales Co. v. United States*, 63 S. Ct. 1265, 1268 (1943) (rejecting a claim that "so long as the seller does not know there is a conspiracy between the buyer and others, he cannot be guilty of conspiring with the buyer, to further the latter's illegal and known intended use, by selling goods to him"); *Elliott*, 876 F.3d at 864 (holding expertise not "required to assess the guilt of a medical professional distributing drugs . . . where . . . such distributions plainly exceed medical use."); *United States v. August*, 984 F.2d 705, 713 (6th Cir. 1992) ("There are no specific guidelines concerning what is required to support a conclusion that an accused acted outside the usual course of professional practice."). The Court's instructions, including the deliberate ignorance portion,[14] closely tracked what the Sixth Circuit described as "not only adequate, but an example of model instructions for" pill mill cases. *Volkman*, 797 F.3d at 386–87.

At bottom, the Court made clear to the jury that a conviction for "any one of the defendants" as to the conspiracy charge required the government to prove, beyond a reasonable doubt, "that

_____

[14] As to Mithavayani's claim that there was no case evidence supporting the deliberate ignorance instruction, the Court, first, notes that Defendant's own review of the evidence supports the instruction. Specifically, Mithavayani concedes that one of his roles was to instruct TPI personnel on "how to follow the law[,]" that he co-owned HCM "which managed administrative functions at TPI[,]" that hundreds of TPI patients were violating policies that his company implemented, and yet insists that there was no proof that he had direct knowledge that Dr. Gowder was prescribing illicitly. *See* DE 417 at 2–3. Trial proof also established that Mithavayani was an experienced businessman and that his profit margin on TPI's revenue was several times that of his other businesses. A defendant, aware of the law, who believes there is "a high probability" that there is illicit activity occurring and acts to screen himself from direct knowledge of that fact while willfully aiding and reaping exorbitant profits therefrom is precisely the type of proof field to which deliberate ignorance applies. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). In short, the proof supported use of the repeatedly approved deliberate ignorance instruction. *See id.* at n.9 (approvingly citing the Sixth Circuit's formulation); *United States v. Mitchell*, 681 F.3d 867, 876 n.51 (6th Cir. 2012). Moreover, even if the instruction's inclusion were erroneous, it would be "harmless as a matter of law." *United States v. Mari*, 47 F.3d 782, 786 (6th Cir. 1995).

the defendant knew the conspiracy's main purpose and voluntarily joined the conspiracy intending to help advance or achieve its goals." DE 400 at 11–12 (Instruction #12). The jury, as a matter of fact and logic, was free to find that the non-doctors could not have known of the alleged improper prescribing purpose based on their lack of training. Indeed, Mithavayani pursued this theory throughout. The jury defensibly rejected the argument, and Mithavayani provides nothing to show that the conviction was a result of confusing, misleading, or prejudicial jury instructions.

*Severance*

Third, Mithavayani, though failing to address the applicable rules or standards, asserts that "the Court allowed the case against Combs to be tried as part of an overall TPI conspiracy over objection of Mithavayani." DE 417 at 7. It is not clear what "objection" Mithavayani is referring to, and he offers no citation to explain. Certainly, Mithavayani filed a motion to sever, but the clear thrust of the motion request was severance "from doctors." DE 197 at 4.[15] Combs, like Mithavayani, is a non-doctor. Further, even if the court construed the (untimely) pretrial motion as generally seeking severance, Mithavayani, at minimum, entirely failed to raise any of the arguments he now raises. He thus waived his rights concerning such issues. *United States v. Sims-Robertson*, 16 F.3d 1223 (6th Cir.), *amended sub nom. United States v. Morrell*, 33 F.3d 55 (6th Cir. 1994) ("Failure to raise an issue involving a misjoinder or a defect in an indictment prior to trial results in a waiver of a defendant's rights concerning the issue."). Finally, the Court notes the dodgy logic in arguing that Mithavayani was prejudiced by proof regarding a defendant that the jury unanimously found was **not** a TPI-conspiracy member.

*Rodenberg Proof*

---

[15] In the severance motion, Mithavayani mentioned Combs's name once, in a footnote, while describing the case posture. *See id.* at 1 n.1.

Fourth, Mithavayani questions the Court's admission of proof related to Dr. Thomas Rodenberg. Other than Rule 403, Mithavayani cites to no rules or other authority to guide the Court's review. Mithavayani's other arguments, as best the Court can tell, fall under Rules 401 & 404. Ultimately, the Court sees no exclusionary basis on the cited or uncited grounds.

Rodenberg accepted a TPI job offer in 2012. Until June 2011, Rodenberg worked at Pompano Beach Medical Corporation (Pompano). Gov. Ex. 46 (CV) at 2. TPI ordered Rodenberg prescription pads on August 15. Gov. Ex. 47 (Prescription Pad Order). He was scheduled to begin work on September 1. However, by August 17, reports indicated that Rodenberg had been criminally charged for his work at Pompano, which authorities considered a pill mill. Gov. Ex. 58 (Article – "DEA Arrests Doctors in Pompano Beach Pill Mill Bust"). Rodenberg never showed up to work at TPI. His resume and the news story, regarding a DEA bust of Pompano and naming Rodenberg, were in TPI's files.

"Relevance requires only that a piece of evidence make a fact in issue more probable than it would be without the evidence." *United States v. Neuhausser*, 81 F. App'x 56, 65–66 (6th Cir. 2003); Fed. R. Evid. 401(a). As to relevance, Mithavayani appears to argue that Rodenberg's pre-TPI conduct was irrelevant because there was no proof that anyone at TPI knew about him being charged. Yet, potential knowledge of Rodenberg's pre-TPI activities was, in part, precisely what the Government introduced the at-issue documents to show. Rodenberg's CV, found at TPI, tends to show that TPI was aware that Rodenberg worked at Pompano. The script pad tends to show that TPI had gone through the process of recruiting and hiring Rodenberg. Indeed, there was testimony that Rodenberg visited the clinic during recruitment. The August 17 article tends to show that Rodenberg's Pompano experience included illicit activity. Collectively, the Rodenberg proof

logically increased the probability that TPI—doing its due diligence[16] regarding a potential new physician hire—would have inquired about known recent Pompano experience and, given his dubious Pompano prescribing,[17] would have learned that Rodenberg may have authored questionable prescriptions. The Government was not required to directly prove knowledge of Rodenberg's Pompano conduct before additional proof regarding such knowledge became relevant in this case. *Cf. United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) ("[D]efendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence."). If two pieces of evidence tend to prove the same fact, the only Rule 401 question is whether that fact "is of consequence in determining the action." FRE 401. Here, Mithavayani's knowledge of Rodenberg's Pompano conduct obviously clears the materiality hurdle. If Mithavayani hired a doctor that he knew was fast and loose with his prescribing, that fact was undoubtedly consequential (and particularly so, given Mithavayani's recursive absence of knowledge claims). The Court notes that Pompano's owner was one of the professional references Rodenberg listed on his CV; presumably, the HCM managers checked Rodenberg's references, because they had the CV. The document showed a conspicuously inconsistent

---

[16] As the Court stated at trial, the flipside of this inference would also be consequential. That is, if as the defense persistently claims, "Mithavayani had [no] knowledge of Rodenberg's activities" a juror could reasonably wonder why a pain clinic was not effectively investigating a potential new hire's conduct, during recent prior experience in a nearly identical role, before extending the job offer. There was significant evidence of TPI hiring or affiliating with sketchy doctors, ones with prior disciplinary records or prescribing problems. Mithavayani and Tyndale seemed most interested in finding a willing prescriber as opposed to a well-credentialled physician. Rodenberg's background fit this profile.

[17] To be clear, the relevance of Rodenberg's prior prescribing practice is not dependent upon it actually being illegal. Rather, the ultimate illegality of Rodenberg's Pompano activities is sufficient, but not necessary proof of the relevant point: Rodenberg's prescribing at a pain clinic, one year prior to TPI hiring him to work at a pain clinic, was suspect and germane.

employment geography, a 2011 unexplained employment gap,[18] and a record of seeing 50 pain management patients per day as well as accepting per diem medical employment. *See, e.g.*, Gov. Ex. 46 at 2 (listing simultaneous employment in Knoxville, TN, and three different cities in Florida for the "10/09-6/2010" period); *id.* at 1–2 (during the "7/1/2010-6/30/2011" period, Rodenberg reports a Buffalo, NY "Pediatric Anesthesiology" fellowship contemporaneous with employment at two Florida practices). The background, patient volume, and South Florida roots in particular, squared with the Government's theory of TPI's design.

Such knowledge was not the only relevant purpose for the Rodenberg proof's admission but, to answer Mithavayani's 401 challenge, it suffices. Given the additional Rule 403 challenge, however, the Court also notes—as reflected in Defendant's facile and grossly incomplete summary of the Court's original ruling, DE 417 at 8–9—that the Rodenberg proof was also probative of Rodenberg's perception of what TPI really was. Proof indicating that a doctor with recent pill-mill experience, including its attendant illicit benefits, high volume, and low standards, accepted a TPI job offer speaks to what type of expectations TPI had for its physicians (at least, as Rodenberg saw it). Rodenberg visited TPI and accepted employment there. Logically, Rodenberg's attraction to TPI tends to show his belief that the clinic was, at minimum, not overly concerned with the legality of prescribing. After all, Rodenberg's prior pill-mill involvement lowers the probability that he would have been looking to hang his shingle at a squeaky-clean operation (as Defendants sought

---

[18] 2011 is a difficult year to piece together on the CV. It shows a gap between the 2011 jobs, although a different CV entry suggests continuous work at a South Florida pain clinic during the full period (despite Tennessee residence). There are many overlapping jobs in many removed locations. The case record starkly depicted the rise of pill mills in Florida, the patient pipeline headed south to those clinics, and the gradual northward spread of the phenomenon as laws and enforcement matured. Per Crawley, Tyndale's long-range plan involved this very directional shift, from Florida toward the peripatetic patients. Rodenberg's background and history would have made him a prime (and, as to the case, confirmatory) candidate for employment at TPI.

to portray TPI). Given Rodenberg's Pompano experience, his implicit assessment of TPI is highly relevant to what was, in fact, a TPI physician's role. Further, proof tending to show that TPI's suspect prescribing was apparent to an outsider is also probative of Mithavayani and Tyndale's knowledge, given their daily TPI involvement. TPI's hiring of a recent pill-mill participant, one with South Florida roots and years in the high-volume pain clinic milieu, with the hire occurring in during the very period of the TPI conspiracy, is highly probative on the marks, badges, and operation of TPI itself.

The Rule 404 prong of Mithavayani's challenge warrants little discussion. Proof regarding Defendant's dubious mid-conspiracy hiring decision is clear intrinsic conspiracy evidence that falls outside Rule 404(b)'s ambit. *See United States v. Reyes*, 51 F. App'x 488, 494 (6th Cir. 2002).[19] The proof was offered to show that Mithavayani attempted to hire a loose-prescribing doctor. That fact was directly probative of charge elements, namely: whether Mithavayani knowingly joined and voluntarily participated in the conspiracy. Doctor qualification, or lack of same, was a recurring trial theme, as the jury saw or heard about a parade of lightly-credentialed or blemished practitioners that peopled the Mithavayani-Tyndale operation. As one of them, Dr. Long put it, the owners simply sought "any physician." The hiring of Rodenberg, who could not show up for work because of the DEA fall-out from one of the medical stops listed prominently on his resume, fits neatly into the hiring history of TPI and its management team.[20]

---

[19] To the extent Mithavayani is suggesting the Court's admission of the proof regarding Rodenberg's prior prescribing violated Rule 404(b), the argument is nonsensical. Given that Rodenberg never actually worked at TPI, the Government obviously did not introduce that proof to establish that Rodenberg prescribed illegally at TPI.

[20] The Rodenberg incident echoes other moments of doubtful diligence. At one point, Tyndale dispatched his ex-stripper girlfriend, a prior pain clinic indictee, to recruit a doctor to TPI. Later, in the Murphy endeavor, the HCM owners worked with and relied for logistics on Dr. Long, who, mid-relationship, lost his North Carolina license and then received a felony conviction for diversion.

*Loan Application*

Fifth, Mithavayani argues that admission of a letter he drafted and submitted to Wells Fargo as part of a loan application was error. DE 417 at 9. Contrary to Mithavayani's depiction, the letter was relevant not because it cast Mithavayani as a liar, but because it provided proof, in Mithavayani's own words, regarding his 50% stake in HCM and the extent of HCM's involvement in TPI. *See* Gov. Ex. 97. Indeed, the document contained Mithavayani statements that cut directly against the central defense theory in this case. *Compare* DE 417 at 2 ("There was no evidence at trial from which a rational juror could have determined that Mithavayani had knowledge that the actions of the doctors at the clinic were outside the scope of professional medical practice."), *with* Gov. Ex. 97 (Mithavayani describing HCM's role as "direct complete medical practice management including administrative, **and clinical personnel**" and summarizing HCM's involvement as "complete running of the practice" (emphasis added)). Further, as the United States argues, the Griffin Data description in the letter (which suggests a "very" low-cost data storage service) sharply contrasts with the actual money flow at TPI. Griffin, with no underlying billing, received a significant portion of TPI's proceeds. This inconsistency—a minimal cost component receiving high dollars—was directly probative on the Government's money laundering case. Certainly, Mithavayani lied in the document, but that aspect was truly highlighted only by Defendant, himself, during closing argument. Ultimately, the Court, as to the letter, sees highly relevant contents that outweighed any prejudice risk.

*Tennessee Board of Health*

Sixth, Mithavayani contends that the Court, through its jury instructions, improperly allowed the physicians' admissions before the Tennessee Medical Board to be used against Mithavayani. The Court explicitly instructed the jury that it could not "consider" Moore's and

Gowder's statements before the Board "in any way against any of the other defendants." DE 400 at 34. The admonition occurred during testimony and in the final instructions. The Court rejects the challenge as based on a faulty premise.

*Remaining Claims*

Finally, Mithavayani offers two single-sentence claims regarding his failed motions to sever his case from the Physician Defendants and to compel PMP data production. The Court deems these entirely undeveloped arguments forfeited. *United States v. Bradley*, 917 F.3d 493, 509 (6th Cir. 2019) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal citations and quotation marks omitted)). Alternatively, the Court relies on its prior rulings, unaddressed by Defendant, on these issues. *See* DE 225 (Severance), DE 256 (PMP Data). Additionally, the Court notes Mithavayani's complete failure to acknowledge that the Court **did** assure production of all PMP data the Government held (or controlled) and also facilitated third-party proof. *See* DE 327 (Order directing subpoena issuance).

## IV. CONCLUSION

In sum, neither Mithavayani nor Tyndale presents any claim that warrants relief under Rules 29 or 33. Accordingly, for the stated reasons and under the applicable standards, the Court **ORDERS** as follows:

1. The Court **DENIES** DE 417;

2. The Court **GRANTS** DE 419, only as to the joinder request;

3. The Court otherwise wholly **DENIES** DE 419;

This the 15th day of May, 2019.



Signed By:

*Robert E. Wier*

**United States District Judge**